**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AELEN UNAN and PATRICIA QUINTINO,
on behalf of themselves and all others
similarly situated,

                Plaintiffs,

v.

NICK LYON, in his official capacity as
DIRECTOR, MICHIGAN DEPARTMENT
OF COMMUNITY HEALTH and
DIRECTOR, MICHIGAN DEPARTMENT
OF HUMAN SERVICES

                Defendant.

CASE NO. 2:14-cv-13470

HON. MARIANNE O. BATTANI

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT (Doc. 69), DENYING PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT (Doc. 70), DENYING DEFENDANT'S MOTION**
**TO STRIKE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. 73),**
**STRIKING EXHIBIT A TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, and**
**DISMISSING PLAINTIFFS' MOTIONS TO CERTIFY CLASS (Doc. 3) and**
**FOR PRELIMINARY INJUNCTION (Doc. 4)**

## I.   INTRODUCTION

These matters are before the Court on cross-motions for summary judgment and

on Defendant's motion to strike.  Plaintiffs Aelen Unan and Patricia Quintino seek an

order of summary judgment granting declaratory and injunctive relief.  (Doc. 70).

Meanwhile, Defendant Nick Lyon, Director of the Michigan Department of Community

Health and the Michigan Department of Human Services, seeks summary judgment and

dismissal of the case.  (Doc. 69).  Additionally, he seeks to strike Plaintiffs' motion for

summary judgment for failure to comply with the page limitation.  (Doc. 73).  For the

reasons that follow, the Court **GRANTS** Defendant's motion for summary judgment,

**DENIES** Plaintiffs' motion for summary judgment, **DENIES** Defendant's motion to strike Plaintiffs' motion for summary judgment, and **STRIKES** Exhibit A from Plaintiffs' motion. As the Court's decision renders moot two additional motions that are currently pending, namely, Plaintiffs' Motion to Certify Class (Doc. 3) and Plaintiffs' Motion for Preliminary Injunction (Doc. 4), the Court **DISMISSES** these two motions.

## II.  STATEMENT OF FACTS

Named plaintiffs Aelen Unan and Patricia Quintino are a lawfully immigrated refugee and a permanent resident alien, respectively.  Both applied to receive Medicaid benefits in April and May of 2014, and both received Health Care Coverage Determination Notices approving them for Emergency Services Only ("ESO") but not for comprehensive Medicaid coverage.  These notices did not explicitly state that comprehensive coverage had been denied, only that Plaintiffs were eligible for ESO benefits.  ESO Medicaid does not provide coverage for general or preventative treatment such as checkups, physicals, and treatment for chronic conditions.  Rather, it provides coverage only for emergency room treatment for life threatening conditions. Therefore, at least for a time, both Plaintiffs went without regular medical treatment. Plaintiffs allege that they were entitled to receive comprehensive Medicaid coverage, as individuals attesting on their applications to be "qualified aliens" under 8 U.S.C. §§ 1612(b)(1) and 1641 are entitled to receive full Medicaid benefits for 90 days, pending verification of their immigration status.  Accordingly, Ms. Unan and Ms. Quintino seek to represent a class of similarly situated individuals who were also erroneously denied comprehensive Medicaid benefits.

Defendant admits that the implementation of the Affordable Care Act ("ACA") caused defects in the computer system that processes Medicaid applications, potentially affecting tens of thousands of applications.  It is undisputed that beginning in January 2014, many Medicaid applicants were erroneously assigned to or reverted to ESO Medicaid.  By April 14, 2014, the Michigan Department of Human Services ("DHS") had identified the problem and had begun working on a solution.  DHS invited the Center for Civil Justice ("CCJ"), Plaintiffs' counsel, to refer misassigned applications to them for correction on a case-by-case basis.  For example, after the CCJ initiated the present suit on September 8, 2014, DHS restored Ms. Unan and Ms. Quintino to full Medicaid benefits.  Individuals found to have been eligible were given full benefits, retroactive to their application dates.  Additionally, over the remainder of 2014, DHS implemented a series of corrections to its system and ultimately re-processed thousands of individuals who had been assigned to ESO benefits since January.  By the end of December 2014, DHS reports that it had reprocessed through the computer system over 16,400 cases, affecting 38,000 individuals, that had not already been reviewed and corrected manually.  Presently, it is DHS's position that it has successfully eliminated any systemic misclassification problems, attributing any further errors to worker error.  However, Plaintiffs insist that there continue to be systemic problems and that many Medicaid applicants erroneously assigned to ESO benefits remain unidentified.

As previously mentioned, on September 8, 2014, Plaintiffs filed a complaint (Doc. 1), as well as a Motion to Certify Class (Doc. 3) and a Motion for Preliminary Injunction (Doc. 4).  The relief sought in the Complaint and Motion for Preliminary Injunction

3

primarily requests: (i) declaratory judgment that Defendants have wrongfully denied comprehensive Medicaid; (ii) to enjoin Defendants from denying comprehensive Medicaid to the named Plaintiffs and to the putative class members; (iii) to enjoin Defendants from failing to identify individuals entitled to comprehensive benefits without following the appropriate administrative and federal procedures for processing applications; and (iv) to enjoin Defendants from assigning applicants to ESO Medicaid without adequate notice and meaningful opportunity to be heard.

## III.  STANDARD OF REVIEW

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). That is, the party opposing a

4

motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" Brown v. Scott, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. Anderson, 477 U.S. at 248; McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 251.

## IV. DISCUSSION

### A. Motion to Strike

Defendant seeks to strike Plaintiffs' motion for summary judgment because Plaintiffs included as Exhibit A a 16-page statement of uncontested facts. When combined with its 31-page brief, this document far exceeds the 35-page limit stipulated to by the parties. (See Doc. 71). By including a statement of facts as an exhibit, Defendant argues, Plaintiffs are essentially attempting to circumvent the page limit. Plaintiffs deny that Exhibit A was an attempt to circumvent the page limit and explain that it was merely intended as a convenient compilation of facts.

The body of Plaintiffs' brief contains a short factual statement, and the Court is very familiar with the facts of this case. Many of the uncontested facts contained in Exhibit A are reiterative of what is already contained in the Complaint and other documents before the Court. Therefore, although the Court declines to grant

5

Defendant's motion by striking Plaintiffs' motion for summary judgment in its entirety,

Exhibit A is hereby stricken.

### B. Abstention Doctrine

Defendant requests that pursuant to Burford v. Sun Oil Co., 319 U.S. 315, 318

(1943), this Court abstain from exercising its jurisdiction.  Burford permits a court to

decline to hear a case over which it would otherwise have jurisdiction when, in its

equitable discretion, it determines that it would serve the public interest for a state

government to carry out its domestic policy.  Id.  Where timely and adequate state court

review is available, a federal court should decline jurisdiction in two circumstances:

> (1) [W]hen there are "difficult questions of state law bearing on policy
> problems of substantial public import whose importance transcends the
> result in the case then at bar"; or (2) where the "exercise of federal review
> of the question in a case and in similar cases would be disruptive of state
> efforts to establish a coherent policy with respect to a matter of substantial
> public concern."

Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n, 481 F.3d 414, 423 (6th Cir. 2007)

(quoting New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361

(1943)).  The Burford doctrine is applied only sparingly and "represents a narrow and

extraordinary exception to the duty of the District Court to adjudicate a controversy

properly before it." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996).

The reasoning applied and decision reached in a similar case, Dozier v.

Haveman, No. 2:14-cv-12455, 2014 U.S. Dist. LEXIS 153394 at *12-14 (E.D. Mich. Oct.

29, 2014), in regard to abstention are persuasive.  Although implementation of Medicaid

is carried out by state agencies and may have an impact on state budgets, claims

involving Medicaid are "not of an essentially local concern, but involve[] rather federal

funds and federal regulation."  Id. at * 13 (quoting Parents League for Effective Autism

6

Servs. v. Jones-Kelley, 565 F. Supp. 2d 905, 914 (S.D. Ohio 2008)).  Furthermore,
federal Medicaid laws are "routinely interpreted by federal courts and [require] no
specialized knowledge of state law."  Id.  Like Dozier and Parents League, the present
case requires the Court to examine federal statutory and constitutional requirements
involved in the administration of the Medicaid program.  Defendant has not presented
any evidence demonstrating that this case presents a difficult question of state law or
that exercising jurisdiction would disrupt the state's efforts to establish a coherent public
policy.  Indeed, the Court's exercise of jurisdiction would not interfere with Defendant's
attempts to rectify its computer system, as Defendant insists that all corrections are
complete and no further systemic problems exist.  Accordingly, this Court may exercise
jurisdiction over this case.

### C.  Eleventh Amendment

Defendant next contends that to the extent that Plaintiffs seeks retroactive
Medicaid benefits, the Eleventh Amendment precludes the Court from awarding such
relief.  In the Complaint, Plaintiffs ask the Court to issue relief: (i) declaring wrongful
Defendant's policy and practice of denying comprehensive Medicaid to Plaintiffs either
pending a reasonable opportunity to verify immigration status or once Defendant has
information verifying eligible immigration status; (ii) enjoining Defendant from denying
comprehensive Medicaid until individuals are given a reasonable opportunity to verify
immigration status; (iii) enjoining Defendant from failing to identify individuals
erroneously assigned to ESO Medicaid from January 2014 and ongoing; and (iv)
enjoining Defendant from assigning Medicaid applicants to ESO without adequate
notice and a meaningful opportunity to be heard.  In Plaintiffs' motion for summary

judgment, they additionally request that the Court enter an order requiring Defendant to submit monthly compliance reports detailing the application statuses of all individuals assigned to ESO on an ongoing basis until such time as the Court and Plaintiffs are satisfied that the problem has been resolved.

The Eleventh Amendment prevents federal courts from entertaining cases brought against a state, unless the state consents to the litigation or Congress explicitly abrogates sovereign immunity by statute. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). The watershed case of Ex Parte Young, 209 U.S. 123, 159-60 (1908), created an exception to this immunity by permitting an action challenging the constitutionality of a state official's enforcement of a state law. Young also held that the Eleventh Amendment does not prevent a court from awarding prospective injunctive relief to prevent an ongoing violation of law. Id. at 155-56. These principles, however, were limited in Edelman v. Jordan, 415 U.S. 651 (1974). In that case, a plaintiff challenged the state's administration of the federal-state Aid to the Aged, Blind, or Disabled (AABD) program as inconsistent with federal regulations. Id. at 653. Plaintiffs asserted that the state was improperly authorizing grants under this program effective as of the month in which the applications were approved and not the month in which the application was submitted; additionally, the processing of the application was alleged to violate the federal time requirements. Id. at 655. According to Edelman, although the Eleventh Amendment does not serve as a bar against federal actions seeking prospective relief against states, it does prohibit actions seeking retroactive compensatory relief. Id. at 665-66. Such was the case even though the Court of Appeals had characterized the plaintiff's entitlement to retroactive benefits as "equitable

8

restitution," as the Supreme Court found the relief "indistinguishable in many aspects from an award of damages against the State." Id. at 668. This issue is even further refined in Milliken v. Bradley, 433 U.S. 267, 289 (1977), which held that if the relief sought would require state expenditures "incidental to" instituting a change in state conduct, the Eleventh Amendment would not preclude the action.

Plaintiffs contend that they seek only prospective relief, in that they request an order granting comprehensive Medicaid coverage ongoing from the date of the order. They further urge the Court to find that any award of retroactive benefits would be merely incidental to the award of prospective benefits. There is some authority supporting Plaintiffs' position that an award of retroactive Medicaid benefits is not the type of award precluded by Edelman. See Morenz v. Wilson-Coker, 415 F.3d 230, 237 (2d Cir. 2005) ("[T]he order that payments begin retroactively is not compensation for accrued liability, but is rather an incident of the present eligibility determination required by the Medicaid statute itself. Back payments are therefore necessary to compliance with the district court's prospective order." (citations omitted)); New York City Health & Hosps. v. Perales, 50 F.3d 129, 135 (2d Cir. 1995) (noting that the Eleventh Amendment does not prohibit "certain monetary awards . . . [that are] ancillary to a grant of prospective relief against a state"). Other circuits, however, have arrived at the opposite conclusion. See, e.g., Reames v. Oklahoma, 411 F.3d 1164, 1167-68 (10th Cir. 2005) (in a case disputing Medicaid co-pays, the court "distinguish[ed] the remedy for past misinterpretations of federal law (reimbursement for co-pays already paid) from the remedy for future ones (ordering Oklahoma prospectively to cease taking a co-pay)," finding that an award of retroactive benefits would be indistinguishable from an

9

award of damages); Caldwell v. Wallace, 755 F.2d 870, 873 (11th Cir. 1985) (holding that an appellant was not entitled to collection of retroactive Medicaid benefits pursuant to Edelman).  Ultimately, an award of retroactive Medicaid benefits is more akin to compensation than to a cost incidental to a prospective change in state conduct. Indeed, the relief sought in Edelman is nearly identical to part of the relief requested in the present case – "a permanent injunction enjoining the defendants to award the entire class of plaintiffs all AABD benefits wrongfully withheld."  415 U.S. at 656.  The Supreme Court concluded that the Eleventh Amendment prohibited a decree ordering retroactive payment of benefits found to have been wrongfully withheld.  Id. at 673.

Plaintiffs' argument that Edelman is inapplicable because the Healthy Michigan Plan is entirely federally funded is unavailing.  According to 42 U.S.C. § 1396d(y)(1)(A), programs such as the Healthy Michigan Plan are currently entirely federally-funded. However, at oral argument, Plaintiffs acknowledged that many potential plaintiffs are seeking benefits under Medicaid programs other than the Healthy Michigan Plan that are both state and federally funded.  The welfare program at issue in Edelman was likewise funded by both the state and federal governments.  See 415 U.S. at 653. Accordingly, the outcome in Edelman is controlling here.  Although the Court is constrained to ordering only prospective relief, a state is required by federal statute to provide corrective, retroactive payments to a Medicaid applicant if a hearing results in a favorable decision for that applicant.  Randall v. Lukhard, 709 F.2d 257, 269 (4th Cir. 1983).  See also 42 C.F.R. § 431.246 ("[I]f . . . the hearing decision is favorable to the applicant," then the state "agency must promptly make corrective payments, retroactive to the date an incorrect action was taken.").  Accordingly, although the Court is unable

10

to order injunctive relief in the form of retroactive Medicaid benefits to Plaintiffs, their right to retroactive benefits is nonetheless protected by statute.  Further, this matter is not dispositive of the entire case, as the Court may order the prospective award of benefits.

### D.  Mootness

The doctrine of mootness is aptly summarized as follows: "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980).   Mootness thus prevents courts from hearing cases "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Geraghty, 445 U.S. at 396 (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).  A party has a legally cognizable interest when he or she has a personal stake in the outcome of the dispute.  Geraghty, 445 U.S. at 396.  In short, "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  North Carolina v. Rice, 404 U.S. 244, 246 (1971).

This District Court has recently confronted a case presenting many of the same questions currently at issue.  See generally Dozier, 2014 U.S. Dist. LEXIS 153395.  In Dozier, Plan First! Medicaid program enrollees sued DHS and the Michigan Department of Community Health for termination of their benefits pursuant to the phasing out of the Plan First! program without first determining whether each enrollee was eligible for a different Medicaid program such as the Healthy Michigan Plan.  Id. at *2.  After the filing of the lawsuit and the motion for class certification, the defendants reevaluated the

named plaintiffs' eligibility for Healthy Michigan and enrolled each of the plaintiffs in that program.  Id. at *16.  Likewise, after additional, prospective plaintiffs sought to intervene, these individuals were also enrolled in Healthy Michigan.  Id. at *18.  The court found that the named plaintiffs' individual substantive claims were moot because, having already received all relief the court could provide, they no longer retained a personal stake in how the claims were to be resolved.  Id. at *20-21.  Nonetheless, Dozier ultimately granted class certification, reasoning that class representatives have two types of claims: (1) individual substantive claims on the merits and (2) procedural claims that they are entitled to represent a class.  Id. at *18-19 n.3 (citing Geraghty, 445 U.S. at 401–04).

The Supreme Court held in United States Parole Commission v. Geraghty that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied. The proposed representative retains a 'personal stake' in obtaining class certification sufficient to assure that Art. III values are not undermined."  445 U.S. at 404.  Cf. Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1529 (2013) (holding, in the context of a collective action seeking damages under the FLSA, that a tender of all damages alleged mooted a plaintiff's claim because,"[i]n the absence of any claimant's opting in, respondent's suit became moot when her individual claim became moot, because she lacked any personal interest in representing others in this action.").  Although the holding in Geraghty was explicitly limited to appeals of the denials of class certification, the reasoning is nonetheless pertinent and instructive.  Cf. Brunet v. City of Columbus, 1 F.3d 390, 400 (6th Cir. 1993) (distinguishing Geraghty from a case where

the named plaintiffs' interests had become moot prior to the filing of a motion for class certification and where plaintiffs had affirmatively accepted a settlement offer).

Accordingly, Dozier held:

> [I]f a defendant has unilaterally mooted the named plaintiffs' claims *while their motion for class certification is pending*, and has mooted the claims of those that seek to intervene and serve as surrogate representatives, and *there are still other proposed class members* willing to serve as surrogates, the case is not moot.

2014 U.S. Dist. LEXIS 153395 at *26 (emphasis added).  Indeed, in order for a court to have a reasonable opportunity to consider and determine a motion to certify class, an offer or tender on the part of a defendant to make named plaintiffs whole does not render the plaintiffs' interests moot if a motion to certify class is pending before the court.  Carroll v. United Compucred Collections, Inc., 399 F.3d 620, 625 (6th Cir. 2005); Susman v. Lincoln Am. Corp., 587 F.2d 866, 870 (7th Cir. 1978).  Defendant attempts to differentiate Carroll based on the facts that a magistrate judge had recommended granting class certification and that the defendant moved to dismiss as moot *before* the offer of settlement had been accepted.  However, if the Court accepted this argument, the policy issues controlling in Carroll would be undermined.  Since Defendant unilaterally controls whether Plaintiffs receive the relief requested, Plaintiffs did not have an opportunity to accept or reject a tender.  As in Carroll, "a tender made to the individual plaintiff while the motion for certification is pending could prevent the courts from ever reaching the class action issues, [and] that opportunity is at the mercy of a defendant."  399 F.3d at 625.

13

Having determined that Defendant may not evade litigation simply by providing full Medicaid benefits to the named Plaintiffs, the Court must next examine whether there exist other potential class members with live claims.  See Sosna v. Iowa, 419 U.S. 393, 401 (1975) (finding a class action not to be moot where, "[a]lthough the controversy is no longer alive as to . . . Sosna, it remains very much alive for the class of persons she has been certified to represent.").  The Court proceeds to evaluate whether each claim advanced in the Complaint remains live.

**1.**     Counts I, II, and III

Counts I, II, and III concern Defendant's alleged violation of Plaintiffs' rights to receive comprehensive Medicaid benefits indefinitely, to a reasonable opportunity to provide verification of immigration status, and to receive comprehensive Medicaid benefits for a reasonable time pending verification of their immigration status, respectively.

Defendant has submitted the sworn affidavit of Kimberly Woods, a Business Relationship Manager who serves DHS's Medicaid Compliance Program in the implementation of information technology relating to changes to Medicaid.  (Doc. 69, Ex. 9).  According to Ms. Woods, the timeline detailing Defendant's efforts to correct the systemic computer issues, attached to her affidavit as Exhibit B, is accurate.  (Id. at ¶ 6).  This timeline demonstrates that a short-term solution to the computer issues was implemented on August 3, 2014.  Although this solution correctly assigned individuals to comprehensive Medicaid if they attested to being qualified immigrants on the application, it was only a *prospective* solution for applications submitted after August 3.

14

On October 25, November 7, and November 26, 2014, DHS implemented a series of corrections to allow it to identify and fix *retroactive* applications. Although DHS reprocessed some applications on November 7, this solution appears to have been flawed and required an adjustment on November 26. With these corrections in place, between December 13 and December 20, 2014, DHS reprocessed Medicaid applications from the following groups: (i) individuals assigned to ESO prior to August 3, 2014, whose applications had not yet been reprocessed (1,216 applications affecting 2,830 individuals); (ii) individuals assigned to ESO prior to August 3, 2014, who had the November 7 data fix applied (15,015 applications affecting 35,455 individuals); (iii) individuals who applied and were assigned to ESO between October 25, 2014, and November 7, 2014, who did not indicate immigration status but received no follow up (11 applications affecting 11 individuals); and (iv) individuals who applied and were assigned to ESO between November 7 and November 26, 2014 (112 applications affecting 256 individuals). Corrections implemented on December 30, 2014, and April 2, 2015, identified 1,227 and 2,895 individuals, respectively, who were redetermined to be eligible for ESO and were therefore moved from full coverage to ESO coverage. The corrections moved these individuals back to full coverage pending DHS's ability to send adequate notice of this negative action. Lastly, on June 20, 2015, additional corrections were implemented permitting DHS to reprocess: (i) 1,003 individuals who were either documented aliens whose immigration status was not already in the record or individuals whose historical citizenship or alien records were already in the system; and (ii) 979 individuals who were currently on ESO but who were determined to be eligible between August 3, 2014, and October 25, 2014. (Doc. 69, Ex. 9 ¶ 7).

15

Over the period from December 11, 2014, through May 18, 2015, DHS processed a total of 346,740 Medicaid applications for 508,923 individuals. (Doc. 58, Ex. C). Of these, 9,101 applications, affecting 12,041 individuals, were assigned to ESO. (Id.). DHS discovered that 788 of these cases, affecting 898 individuals, were erroneously assigned to ESO, meaning that 8.7% of ESO case assignments were erroneous. Of all Medicaid applications, 0.2% resulted in erroneous ESO assignments. DHS performed a second analysis for the period spanning from May 19, 2015, through August 14, 2015. (Doc. 69, Ex. 1). Over this period, DHS received 150,641 Medicaid applications for 230,217 individuals. (Id.). Of these, 3,595 applications, affecting 4,378 individuals, were assigned to ESO. DHS discovered that 218 of these cases, affecting 246 individuals, were erroneously assigned to ESO, resulting in an error rate of 6.1% for ESO case assignments and 0.015% for total Medicaid applications. In a sworn affidavit, Holly Roderick, Department Specialist in DHS's Bureau of Technology Project Services, attests that any systemic problems have been resolved and that any current erroneous ESO assignments are the product of worker error rather than residual systemic computer problems. (Id. at ¶ 8). Accordingly, Defendant urges the Court to find that all relief in this regard has already been voluntarily provided to any potential plaintiff, thus rendering these claims moot.

Plaintiffs insist that there remain hundreds to thousands of putative class members in 2015 alone. First, Plaintiffs point to Defendant's estimations that the number of individuals impacted by the computer problems between January and December of 2014 ranged from 29,787 to 57,619 (see Doc. 67, Ex. A, Interrog. 15) to 68,000 (see Doc. 1, Ex. C). However, relying on Defendant's own timeline, Plaintiffs

16

calculate that DHS reprocessed a total of only 39,779 individuals in 2014.  (See Doc. 70, p. 13; Doc. 69, Ex. 9).  Accordingly, there remain anywhere from 17,840 (the different between 57,619 and 39,779) to 28,221 (the difference between 68,000 and 39,779) individuals who may have been erroneously assigned to ESO whose cases have not yet been reviewed.

As argued by Defendant, the estimates regarding the total number of individuals potentially affected by the computer system error were just that – rough *estimates*.  In contrast, the numbers provided in the sworn affidavits and the timeline described above were the result of accurate computer analyses.  Indeed, the estimate of 68,000 individuals was generated by the Michigan Department of Technology, Management and Budget and explicitly stated that input from DHS was required.  (Doc. 1, Ex. C). Likewise, the 29,787 and 57,619 estimates were provided in response to an interrogatory Defendant objected was vague, confusing, overly broad, and called for speculation.  (Doc. 67, Ex. A, Interrog. 15).  The interrogatory directed, "Please state the number of eligible individuals assigned [ESO] Medicaid at any time in 2014."  Defendant argued that the phrase "at any time" required "speculation as to whether Plaintiffs seek a running total on a case by case basis or a snapshot of a single, random time period." The wording of the interrogatory is indeed ambiguous.  Defendant's flat response of "29,787 or 57,619," without qualification or explanation is equally unenlightening.  Even if the original estimates were greater than the number of cases reprocessed, all this fact would demonstrate is the possibility that there remain individuals who *may have been* erroneously assigned to ESO, not affirmative evidence that there are individuals who *have been* erroneously assigned to ESO.  But the corrections and reprocessing

described in Defendant's timeline and Ms. Woods' affidavit appear to cover all individuals misassigned to ESO in 2014.  The systemic problem was corrected as to prospective applications beginning in August 2014.  Some applications submitted prior to August were reprocessed on November 7, 2014.  Although the correction implemented on that date was flawed, DHS resolved the problem and reprocessed these applications again, along with all other applications submitted prior to August, in December 2014.  Further corrections and reprocessing took place on June 20, 2015. The timeline indicates that any flaws identified in the system corrections were resolved, and the affected applications were reprocessed.

Second, Plaintiffs argue that Defendant's February 2015 representation that DHS had resolved the systemic issues is belied by the fact that in April 2015, Defendant acknowledged that approximately 2,900 individuals were wrongly assigned to ESO Medicaid between December 30, 2014, through April 2, 2015.  There appears to be confusion regarding to what this number refers.  As argued in Defendant's response brief, 2,895 individuals were *correctly* assigned to ESO but were assigned back to comprehensive Medicaid only because they had not received adequate notice of the negative action, pending such time as DHS could resolve the notice issue.  (See Doc. 69, Ex. 9).  Accordingly, these 2,895 individuals were not erroneously assigned ESO. Plaintiffs assert that this argument refers to the approximately 2,000 individuals reprocessed on June 20, 2015.  (See id.).  However, the evidence demonstrates that any remaining systemic problem was resolved and that any individuals erroneously assigned to ESO were identified and granted full Medicaid.  Plaintiffs have not come forward with affirmative evidence demonstrating the existence of individuals whose

applications were erroneously assigned to ESO because of a systemic error and yet remain unresolved.

Third, Plaintiffs argue that there remain significant numbers of individuals erroneously assigned to ESO based on Defendant's own statistics – for the period between December 11, 2015, and May 18, 2015, DHS discovered that 788 cases, affecting 898 individuals, had been misassigned to ESO, for an error rate of 8.7%. Plaintiffs also argue that these statistics are under-representative, as they account only for those cases brought to DHS's attention, not from a review of all cases assigned to ESO during this period. Plaintiffs' argument is problematic in many respects. To the extent that Plaintiffs are suggesting that DHS should be forced to double-check every single Medicaid application assigned to ESO, such an action would be a ludicrous waste of time and resources and would undermine the administrative appeal mechanism in place. To the extent that Plaintiffs argue that these error rates demonstrate the perpetual existence of potential class members, they appear to overlook the fact that the 788 cases identified have likely already been resolved. To the extent that Plaintiffs argue that any rate of error at all is unacceptable, this argument must also fail. Plaintiffs have offered no statistical evidence or expert witness testimony establishing that the error rates reported are unacceptable. When questioned what further discovery was needed, Plaintiffs' counsel did not indicate that she required any additional information. Therefore, the Court has no standard by which to measure DHS's compliance with the Medicaid statute. Furthermore, it is farfetched indeed to believe that Congress intended to impose a federal obligation on the states to maintain a flawless system to administer a program as complex as Medicaid. See Frazar v. Gilbert, 300 F.3d 530, 544 (5th Cir.

2002), *rev'd on other grounds sub nom*, Frew v. Hawkins, 540 U.S. 431, 436 (2004) ("Perfect compliance with such a complex set of requirements is practically impossible, and we will not infer congressional intent that a state achieve the impossible."). As reasoned in Frazar, the Medicaid statute contains provisions delegating oversight authority with respect to state participation in the Medicaid program to the Secretary of Health and Human Services. See 42 U.S.C. §§ 1396a(a)(43)(D), 1396c.

Fourth, Plaintiffs argue that the error rates are much higher in light of Defendant's interrogatory admissions that out of "29,787 or 57,619" total assignments to ESO in "at any time" in 2014, "4,688 or 27,277" of these assignments were made erroneously. As discussed above, these figures were provided with no qualification or explanation and under objection to the interrogatory for vagueness. The Court can glean no meaningful information from these numbers. Additionally, the Court agrees that these numbers are likely inaccurate, given the fact that the interrogatory requested "the number of eligible individuals mistakenly, erroneously, incorrectly, or wrongly assigned [ESO] Medicaid at any time in 2014." (Doc. 67, Ex. A, Interrog. 16). The interrogatory fails to specify the reason for the mistaken, erroneous, or incorrect ESO assignment. As Defendant points out, these numbers thus incorporate misassignments resulting from applicant error or worker error, as opposed to the subject matter of the present suit – systemic computer error. Further, Defendant's objection to the vagueness of the phrase "at any time" is well taken, as discussed above.

Last, Plaintiffs rely on a host of exhibits attached to their motion in an attempt to show that Defendant's system continues to be defective, as DHS continually relies on system "overrides" to resolve ongoing ESO issues. (See Doc. 70, Exs. H, I, J, K, L, M,

N).  Some of these exhibits go beyond the scope of the present lawsuit, which is limited to DHS's failure to provide comprehensive benefits to applicants attesting to be "qualified immigrants."  Exhibit H involves a technical issue regarding eligible immigrants' eligibility for full Medicaid upon achieving a five-year "bar."  Exhibit I is an e-mail admitting a various problems with the automatic, computerized approvals of Medicaid applications, including "[d]uplicate ID's, incorrect HMP approvals [due to applicant error], and ESO coverage for various reasons."  This exhibit is too vague to be probative or relevant.  Exhibit N includes DHS e-mails acknowledging a systemic issue erroneously assigning applicants to ESO, but these e-mails were sent in 2014, when Defendant admits it was still working on a resolution.  Exhibits J, K, and M include a series of DHS e-mails from May through July 2015 regarding erroneous assignments of individual non-citizen applicants and the need to apply overrides in order to correctly assign the applicant to full Medicaid.  For instance, an e-mail in Exhibit M, dated June 22, 2015, states, "[T]here are probably more [misassigned cases] that we don't know about as the some [sic] workers are not checking the type of [Medicaid] being approved and we don't find out until the client calls.  This case has everything correct on it and still is approving ESO."  Far from being damaging, these e-mails imply that Defendant is working to resolve any erroneous assignments.  Further, these exhibits fail to show that these individual cases are anything more than the result of an imperfect system.

Ultimately, Plaintiffs have failed to come forward with affirmative evidence of their own demonstrating the existence of individuals who were erroneously assigned to ESO because of systemic technical problems and who are therefore able to serve as potential class members.  The most Plaintiffs have shown is the fact that errors continue

to occur but not the cause of these errors or that the rate of error is legally problematic. This showing is insufficient to survive Defendant's motion for summary judgment on the basis of the mootness doctrine.

**2.**    Counts IV and V

Counts IV and V concern Defendant's failure to provide Plaintiffs with constitutionally adequate notice of their denial of Medicaid benefits and violation of Plaintiffs' right to an opportunity to be heard concerning full Medicaid denial.  DHS developed a revised notice with language it claims comports with constitutional requirements.  (See Doc. 69, Ex. 1, Attach. B).  These revised notices were sent to individuals assigned to ESO on or after May 4, 2015.  The revised notices contain an "Approval Information" portion, wherein an applicant is notified of his or her approval for ESO Medicaid.  Below that section is a "Denial Information" portion that states, "If your approval information says above that you have Emergency Services Only (ESO), you have been denied full Medicaid coverage."  Additionally, the notice sets forth the reasons and legal bases for denial of full Medicaid and informs applicants of their right to appeal this determination at a hearing at which they may be represented.

On August 20, 2015, DHS also mailed separate notices to those individuals assigned to ESO between January 1, 2014, and May 4, 2015.  (Doc. 69, Ex. 1 ¶ 11). These notices informed the individuals that their assignment to ESO functioned as a denial of full Medicaid benefits and indicated their right to appeal this decision.  (See Doc. 69, Ex. 3, Attach. A).  The body of this notice reads, in part:

Dear Beneficiary,

Re:  Emergency Services Only Medicaid

> Our records show that you have or had Emergency Services Only (ESO) Medicaid between January 2014 and May 2015.  This means you were denied full Medicaid coverage because we did not have information about your immigration status that showed you qualified for full Medicaid, or, according to the information we did have about your immigration status, you were not eligible for full Medicaid.

The revised notice then describes how the applicant may appeal this denial.

Plaintiffs do not dispute whether the revised notice sent to applicants assigned to ESO from May 4, 2015, onward are constitutionally adequate.  Plaintiffs also did not raise any constitutional challenges in their briefs to the notices mailed to individuals assigned to ESO between January 1, 2014, and May 4, 2015.  Nor have they argued that there remain individuals who have not yet received one of these two notices.  It was not until oral argument that Plaintiffs challenged the adequacy of the second notice mailed to applicants assigned to ESO between January 1, 2014, and May 4, 2015.  Specifically, Plaintiffs argued that the notice fails to identify the beneficiary by name or to provide a more precise time span during which the beneficiary had been assigned to ESO.  These challenges lack merit.  First, the notice does identify the beneficiary by name in the inside address portion of the letter.  Second, this notice is a form letter appropriate for mailing to many Medicaid applicants.  Specifying the precise dates over which each applicant was assigned to ESO would require DHS to issue individualized notices to each applicant, which would be unduly burdensome.  Accordingly, the Plaintiffs have failed to demonstrate that there remain individuals assigned to ESO who have not received adequate notice.

Plaintiffs also contend that absent a court order, Defendant is free to revert to the former, constitutionally inadequate notice, a reasonable fear in light of the fact that Defendant does not concede that the original notices failed to provide due process or to

inform individuals sufficiently of their denials of full Medicaid.  Voluntary cessation of allegedly illegal conduct does not necessarily render a case moot, as a defendant is free to return to his old ways, and it is in the public interest to have the legality of the challenged practices settled.  United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953).  However, a defendant may nevertheless establish that a case is moot if it can meet the heavy burden of showing that "'there is no reasonable expectation that the wrong will be repeated.'"  Id. (quoting United States v. Aluminum Co. of Am., 148 F.2d 416, 448 (2d Cir. 1945)).  Where the defendant voluntarily discontinuing the offending action is the government, greater deference is afforded to its assurances:

> We note additionally that cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. According to one commentator, such self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.

Mosley v. Hairston, 920 F.2d 409, 415 (6th Cir. 1990) (quoting 13A Wright, Miller & Cooper Federal Practice and Procedure § 3533.7, at 353 (2d ed. 1984)).

Here, Defendant has expended energy and resources toward developing and implementing a revised notice that adequately informs individuals of their denial and of their opportunity to be heard.  Defendant's assertions that the original notices were constitutional are nothing more than disclaimers of liability rather than indications of DHS's intent to revert back to the original notices.  Therefore, there is no reasonable basis for assuming that Defendant will not continue to use the mutually agreeable revised notices.  Thus, Plaintiffs' claims regarding inadequate notice are moot, and Defendant is entitled to summary judgment.

### E.  Private Enforcement of Medicaid Provisions

Defendant next argues that none of the statutory underpinnings for Plaintiffs' claims confers a private right of action.  In order for a statutory provision to confer a federal right that is privately enforceable under § 1983, (i) "Congress must have intended that the provision in question benefit the plaintiff;" (ii) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial resources;" and (iii) "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."  Gonzaga Univ. v. Doe, 536 U.S. 273, 282 (2002) (quoting Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).  Nothing short of an unambiguously conferred right will support a cause of action under § 1983, and broad or vague "benefits" or "interests" may not be enforced.

Count I of Plaintiffs' Complaint alleges violation of the right to prompt, comprehensive Medicaid coverage pursuant to 42 U.S.C. §§ 1396a(a)(8) and (a)(10)(A).  This District has concluded that these provisions of the Medicaid Act meet the criteria of the Blessing test and therefore confer a privately enforceable right of action under § 1983.  Westside Mothers v. Olszewski, 368 F. Supp. 2d 740, 762 (E.D. Mich. 2005).  On appeal, the Sixth Circuit did not challenge this finding, instead addressing the scope of those rights.  Westside Mothers, 454 F.3d 532, 539-41 (6th Cir. 2006).  This Court follows the conclusion that §§ 1396a(a)(8) and (a)(10)(A) are privately enforceable.  However, to the extent that Plaintiffs bring this claim under 42 U.S.C. § 1396u-7, they do not cite to a particular provision within the section, nor do they respond to Defendant's argument that there is no privately enforceable right flowing from this statute.  Section 1396u-7 relates to states' ability to amend their

Medicaid programs, and it is unclear how any portion of this section is relevant to Plaintiffs' case.  Accordingly, the Court finds that there is no privately enforceable right conferred by § 1396u-7.

Defendant argues that the Supreme Court's decision in Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378 (2015), has limited the scope of the private enforcement of Spending Clause legislation.  Defendant relies on Armstrong's reasoning in Part IV of the opinion, which states that where a statute provides an explicit means of enforcement such as withholding of funding, the provision suggests an intent to preclude other remedies.  Id. at 1387.  Further, Defendant urges the Court to adopt the approach advanced in Armstrong that "[t]he sheer complexity associated with enforcing §30(A) [of the Medicaid Act], coupled with the express provision of an administrative remedy, §1396c, shows that the Medicaid Act precludes private enforcement of §30(A) in the courts."  Id. at 1385.  However, as Plaintiffs point out, Part IV of the Armstrong decision, which concerns whether there is a privately enforceable cause of action, is not part of the majority decision and is therefore not binding.  See Doc. 75, Ex. B, Barry v. Lyon, No. 13-13185 (E.D. Mich. June 5, 2015), Doc. 130, Op. and Order Den. Def.'s Mot. For Stay of J. Pending Appeal.  At any rate, the provision at issue in Armstrong is substantially different than the provisions confronted in the present case.  Here, § 1396a(a)(8) compels states to provide that "*all individuals* wishing to make application for medical assistance under the plan shall have opportunity to do so," while § 1396a(a)(10)(A) requires states to provide "for making medical assistance available . . . [to] *all individuals*."  42 U.S.C. § 1396a(a) (emphasis added).  In contrast, § 30(A), the provision at issue in Armstrong, is merely a directive to the states without

reference to any individuals' rights.  (42 U.S.C. § 1396a(a)(30)(A) ("[P]rovide such

methods and procedures relating to the utilization of, and the payment for, care and

services available under the plan . . . .").  The discussion in Armstrong regarding the

private enforcement of Medicaid provisions is therefore not binding and is inapposite to

the present action.

Count II alleges a violation of the right to a reasonable opportunity to provide

verification of immigration status pursuant to 42 U.S.C. §§ 1396a(a)(8) and 1320b-

7(d)(4)(A)(i)-(ii).  Although no case law exists regarding the enforceability of § 1320b-

7(d)(4)(A), this provision meets the standard set forth by Blessing and Gonzaga.

According to this provision:

> In the case of such an individual who is not a citizen or national of the
> United States, if, at the time of application for benefits, the statement
> described in paragraph (1) is submitted but the documentation required
> under paragraph (2) is not presented or if the documentation required
> under paragraph (2)(A) is presented but such documentation is not
> verified under paragraph (3)—
>
> [T]he State-- (i) shall provide a reasonable opportunity to submit to the
> State evidence indicating a satisfactory immigration status, and (ii) may
> not delay, deny, reduce, or terminate the individual's eligibility for benefits
> under the program on the basis of the individual's immigration status until
> such a reasonable opportunity has been provided.

42 U.S.C. § 1320b-7(d)(4)(A).  The intent underlying this provision was clearly to protect

non-citizens' rights to obtain Medicaid coverage and to a reasonable opportunity to

provide documentation of immigration status.  The provision's language is drafted in

terms of an identifiable class – "an individual who is not a citizen of the United States."

Therefore, the text is "phrased in terms of the persons benefitted" and "with an

*unmistakable focus* on the benefitted class."  Gonzaga, 536 U.S. at 284.  Additionally,

the provision is worded in the singular rather than in the plural, further emphasizing the

individual.  The statute is not vague or ambiguous as to these rights, and the language is couched in mandatory terms, thus creating a binding obligation on the state.

Count V sets forth a claim for violation of the right to be heard regarding a Medicaid denial pursuant to 42 U.S.C. § 1396a(a)(3).  Applying the Blessing test, the Sixth Circuit has recognized § 1396a(a)(3) as privately enforceable under § 1983.  See Gean v. Hattaway, 330 F.3d 758, 772-73 (6th Cir. 2003).  As to Plaintiffs' claims regarding inadequate notice, they rely not on federal regulations, as advanced by Defendants, but rather on § 1396a(a)(3) and the Fourteenth Amendment, which are undisputedly privately enforceable pursuant to § 1983.

Defendant also argues that the expansion of Medicaid under the Affordable Care Act creates no private right of action.  The Supreme Court has affirmed that the ACA is constitutional but denied that Congress could require the states to participate in the Medicaid expansion.  Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2606-07 (2012).  Accordingly, Defendant reasons, if it is unconstitutional to force states to expand Medicaid, the ACA did not create an individual right of action to enforce the Medicaid expansion against those states choosing to expand the program.  This argument is problematic in many respects.  First, the question regarding whether Medicaid expansion is privately enforceable was not before the Supreme Court in Sebelius.  Second, Defendant's argument implies that Sebelius would function as a bar against any Medicaid compliance action.  Indeed, it does not.  Defendant has admitted that Michigan chose to expand Medicaid coverage pursuant to the ACA.  Doing so does not insulate the state from regulation, as Sebelius expressly held that although "the Secretary cannot apply § 1396c to withdraw existing Medicaid funds for failure to

28

comply with the requirements set out in the expansion," this holding does not "affect the Secretary's ability to withdraw funds provided under the Affordable Care Act if a State that has chosen to participate in the expansion fails to comply with the requirements of that Act." Id. at 2607.  For these reasons, Defendant's argument must fail.

### F. Plaintiffs' Motion for Summary Judgment

#### 1. Failure to Approve Comprehensive Benefits

The Medicaid program was enacted in 1965, supplementing Title XIX of the Social Security Act "for the purpose of providing federal assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301 (1980).  Eligibility for Medicaid benefits is determined in accordance with dozens of different statutorily created eligibility categories.  For example, some categories cover children, pregnant women, parents, or childless adults whose Modified Adjusted Group Income (MAGI) is below specified levels.  Other Medicaid eligibility categories include senior citizens or individuals with disabilities meeting Social Security Administration standards and who meet both financial and non-financial eligibility criteria.

Pursuant to the Welfare Reform Act, Congress rendered certain groups of non-citizen aliens ineligible to receive federal benefits and restricted states' ability to utilize their own funds to provide benefits to certain aliens. See 8 U.S.C. § 1601 et seq.  In order to receive federal funds, Congress required states to restrict eligibility for federal benefits such as Medicaid to citizens and certain "qualified aliens."  Qualified aliens – defined at 8 U.S.C. § 1641 and including legal permanent residents, asylees, and refugees – are entitled to a full range of benefits, the same entitlement as provided to

United States citizens.  See 8 U.S.C. §§ 1612(b), 1622(b); 42 C.F.R. § 435.406(a)(2).

Some qualified aliens otherwise entitled to full benefits are also subject to a five-year

United States residency waiting period before they become eligible.  Id.  On the other

hand, non-citizens who are not qualified aliens or who have not met the five-year bar

are eligible for ESO Medicaid.  See 8 U.S.C. § 1611(b)(1)(A); 42 C.F.R. § 440.255.

Pursuant to 42 U.S.C. § 1396a(a)(8), all eligible individuals have the right to be

furnished Medicaid with reasonable promptness – that is, without any delay caused by

the agency's administrative procedures.  See 42 C.F.R. § 435.930(a).  Applicants who

attest to being qualified immigrants must be provided a reasonable opportunity (90

days) to present documentary evidence of satisfactory immigration status.  42 U.S.C. §

1320b-7(d)(4)(A).  During this time, the state "may not delay, deny, reduce, or terminate

the individual's eligibility for benefits . . . until such reasonable time has been provided."

Id.

Defendants do not dispute the fact that the named Plaintiffs are qualified aliens

who should have been granted comprehensive Medicaid benefits.  In fact, Defendants

admit that a technical error in the computer system used by DHS resulted in the

erroneous assignment of a great number of qualified aliens to ESO Medicaid.  These

individuals were assigned to ESO without an opportunity to provide evidence of their

immigration status.  Consistent with the Court's previous analysis, only prospective

relief may be awarded – either to individuals whose erroneous ESO assignments have

not yet been identified or to individuals who will be erroneously assigned in the future

due to systemic computer malfunction.  The Court has already determined above that

there are no potential plaintiffs remaining to whom it could issue prospective relief, as

DHS has demonstrated that its systemic computer issues have been resolved and that individuals erroneously assigned to ESO have been identified and their applications rectified.  Thus, to the extent that this case is moot, Plaintiffs' motion for summary judgment must be denied with respect to Count II (failure to provide a reasonable opportunity for verification of immigration status) and Count III (failure to provide comprehensive Medicaid benefits pending the 90-day reasonable opportunity).

Plaintiffs' Count I claim for failure to provide comprehensive Medicaid coverage indefinitely is problematic in a different way, as Plaintiffs have not presented sufficient evidence to demonstrate entitlement to comprehensive Medicaid indefinitely, either as to the named Plaintiffs or any potential class member.  The parameters defining "qualified alien" are extremely complex, and the Court has received no briefing or argument regarding this issue.  For example, in order for a permanent resident to obtain qualified alien status, she must show that she:

> [H]as worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act [42 USCS §§ 401 et seq.] or can be credited with such qualifying quarters as provided under section 435 [8 USCS § 1645], and (ii) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 403 [8 USCS § 1613]) during any such period.

8 U.S.C. § 1622(b)(2)(B).  Ms. Quintino, a permanent resident, has not shown or alleged that she meets these criteria.   Further, such inquiries and determinations would be extraordinarily individualized, and the Court cannot make such individualized findings in a class action suit.  See Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 539 (6th Cir. 2012).  As such, Plaintiffs are not entitled to summary judgment on Count I.

## 2.  Inadequate Notice

Counts IV and V of the Complaint set forth claims that the denial notices received by Plaintiffs were inadequate under the Due Process clause of the Fourteenth Amendment and under 42 U.S.C. § 1396a(a)(3).  Section 1396a(a)(3) compels state plans for medical assistance to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  Attendant regulations to this provision require that the state agency notify applicants of the right to obtain a hearing and the method of obtaining one when the applicant first applies to Medicaid. Crawley v. Ahmed, No. 08-14040, 2009 U.S. Dist. LEXIS 40794 at *75 (E.D. Mich. May 14, 2009) (citing 42 C.F.R. § 431.206).  Specifically, a notice denying benefits to an initial applicant must contain: (i) a statement of the applicant's right to a hearing, (ii) the method by which the applicant may obtain a hearing, and (iii) that he may represent himself or use legal counsel, a relative, a friend, or other spokesman.  42 C.F.R. § 431.206(b).  On the other hand, a notice changing or reducing the benefits of an active beneficiary must contain: (i) a statement of what action the State intends to take; (ii) the reasons for the intended action; (iii) the specific regulations that support, or the change in Federal or State law that requires, the action; (iv) an explanation of the individual's right to request an evidentiary hearing; and (v) an explanation of the circumstances under which Medicaid is continued if a hearing is requested.  42 U.S.C. § 431.210.  See also 42 C.F.R. §§ 431.201, 431.206(c)(2), (c)(3), and (c)(4).

In the instant case, Plaintiffs applied for comprehensive Medicaid coverage.  In response, they received Health Care Coverage Determination Notices entitled "Approval Information."  (See Doc. 4, Ex. N; Doc. 28, Ex. B).  Although this notice may have been

misleading, Defendant has created and implemented a revised notice, described in greater detail above, that has been sent to all individuals assigned to ESO from May 4, 2015, onward.  (See Doc. 69, Ex. 1, Attach. B).  As discussed above, Plaintiffs offer no constitutional challenge to the adequacy of this notice.  Indeed, it apprises individuals of their denial of comprehensive Medicaid benefits, the reason and statutory bases for the denial, and the applicant's rights to challenge the denial at a hearing and to be represented at hearing.  Nor do Plaintiffs offer a credible constitutional challenge to the notice mailed to Medicaid applicants assigned to ESO between January 1, 2014, and May 4, 2015.  (See Doc. 69, Ex. 3, Attach. A).  This notice advises individuals of their denial of full Medicaid benefits, the reason for the denial, and their right to appeal this determination.  Because Plaintiffs have not carried their burden of showing a constitutional flaw in the notices, their motion for summary judgment is denied.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, **DENIES** Plaintiffs' Motion for Summary Judgment, **DENIES** Defendant's motion to strike Plaintiffs' Motion for Summary Judgment, and **STRIKES** Exhibit A from Plaintiffs' motion.  Additionally, the Court **DISMISSES** Plaintiffs' Motion to Certify Class and Motion for Preliminary Injunction as moot.

**IT IS SO ORDERED.**

Date:      January 11, 2016                          s/Marianne O. Battani
                                                     MARIANNE O. BATTANI
                                                     United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 11, 2016.

<u>s/ Kay Doaks</u>
Case Manager